UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

TROY D. MILLER,

                Plaintiff,

     v.                                 **WDWI Case No.**  12-C-0267

CAROLYN W. COLVIN,
Commissioner of Social Security,

                Defendant.

---

**DECISION AND ORDER**

---

This is an action for review of the final decision of the Commissioner of Social Security denying plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Plaintiff Troy D. Miller challenges the decision by the Administrative Law Judge (ALJ) denying him benefits because the ALJ failed to follow Social Security Administration (SSA) rulings and regulations. In particular, Miller argues that the ALJ erred by failing to give the proper weights to the opinions of Miller's treating physician and an examining consultative physician. For the reasons stated in this opinion, the Commissioner's decision will be remanded.

**BACKGROUND**

Miller filed an application for SSI benefits on September 26, 2008, alleging disability due to peripheral neuropathy, coronary artery disease, fibromyalgia, obesity, and depression. He was 43 years of age at the time. Miller's medical problems began with the diagnosis and treatment of

Hodgkin's lymphoma in 2003 and 2004. (Tr. 357–58, 361–62.)  Although he has not experienced a recurrence of lymphoma after chemotherapy, radiation therapy, and a bone barrow transplant, Miller developed a series of medical problems that are attributed to his cancer treatment, including peripheral neuropathy and coronary artery disease. (Tr. 417–18, 544.)  He has received a variety of medical care for these illnesses, including medication, surgery, and physical therapy.  (Tr. 643–61, 685–702, 769–75.)  He uses a prescribed cane to walk because of the peripheral neuropathy.  (Tr. 51, 830.)

Miller has also experienced other medical problems, though not all traceable to his cancer treatments.  He had a hernia surgically repaired in December 2006.  (Tr. 364, 370–71, 374.)  He had laparoscopic surgery for gastroesophageal reflux disease, with good results, in June 2007.  (Tr. 394–95, 399.)  In March 2009, he was treated for thrush.  (Tr 711.)  He was diagnosed and treated for seborrhea in June 2009.  (Tr. 679–80.)  He has also complained of weakness, fatigue, difficulty sleeping, cough, shortness of breath, tender points, and pain throughout his body (Tr. 361, 383, 388–91, 401, 406, 413, 417–20, 424, 426, 428, 432, 456, 471 428, 712, 715).  In some cases, these complaints have been diagnosed and resolved or alleviated, but not in others.  For example, Miller experienced an improvement in his shortness of breath following the insertion of stents in 2008. (Tr. 437–39.)  Another procedure to insert stents alleviated chest pain.  (Tr. 598–99.)  Relief from his other complaints—especially the tender points, diffuse myalgias, and neuropathic pain—has been more elusive.  (Tr. 57–58, 393, 414, 419–20, 428–29, 455–57, 471–72, .)  In December 2008, Miller was diagnosed with fibromyalgia with chronic fatigue-like symptoms. (Tr. 472.)  His weight problems—Miller has gained more than 100 pounds between his cancer diagnosis and his hearing (Tr. 64)—are likely attributable to a combination of his difficulty in regularly exercising due to

2

peripheral neuropathy and coronary artery disease, as well as a side effect of medication, especially Lyrica. (Tr. 449, 455–58, 464, 468, 471–72, 544, 598–99, 613, 619, 621.) Finally, Miller has been diagnosed with and intermittently treated for depression since he was diagnosed with Hodgkins lymphoma. (Tr. 59, 226–43, 383, 402, 406–07, 413–14, 420, 810–820.)

As a result of his medical problems, Miller's medical records are voluminous. He has seen a range of doctors from rheumatologists to pulmonary specialists to urologists, in addition to his primary care physician, Dr. Sandhya Garg. The 15-page appendix to Miller's brief summarizes the medical evidence, including the examining and non-examining consultative reports, from August 2006 to March 2011. (Dkt. 10-1.) Of particular note in this appeal, are the reports by Dr. Garg, Miller's treating physician, and Dr. Andrew J. Wright, an examining consultative physician.

Dr. Garg, an internal medicine physician at UWHealth, established primary care with Miller on May 11, 2007. (Tr. 382.) She saw Miller over a dozen times between establishing care and mid-2009 when records from his visits ends. (Tr. 382, 401–02, 406–07, 413–14, 419–20, 423–24, 428–29, 432–33, 451–52, 467–68, 476-77, 619, 708.) His complaints during this period varied but often included symptoms relevant here: fatigue, pain, tender points, difficulty sleeping, shortness of breath, and depression. She prescribed a variety of medications and referred him to a several other doctors based on these complaints. (Tr. 384, 402, 404, 414, 420, 424, 429, 433, 452, 477.) Dr. Garg provided an opinion letter, dated January 4, 2011, opining that Miller would struggle to stay on task, work at a slower pace, require unscheduled breaks, and miss work unpredictably due to his "illnesses." (Tr. 829.) Dr. Garg wrote a second letter, dated January 18, 2011, that indicated Miller was limited in safe driving due to fibromyalgia and required a cane for ambulation because of "painful peripheral neuropathy as a side effect of his chemotherapy." (Tr. 829–30.)

Dr. Andrew J. Wright, a family practice physician, examined Miller in May 2009.  (Tr. 544–47.)  According to Dr. Wright's report, Miller did not have "a truly antalgic gate," but he did use a cane to "limp or shuffle along" at a slow pace.  (Tr. 547.)  Dr. Wright also found that Miller had a "significant functional decline" following his treatment for cancer, including fatiguing easily and pain.  (Tr. 547.)  Upon physical exam, Dr. Wright noted "trigger points along the second and fourth costochondral junctions anteriorly, in the upper trapezius area and the rhomboid area, but not along the deltoids nor the great trochanters nor the medial or lateral epicondyles nor the medial knees or ankles."  (Tr. 546.)  Dr. Wright also found that sensation was not intact in the distal lower extremities to "light touch and 10-gauge monofilament."  (Tr. 546.)  He estimated that Miller could stand for about thirty minutes but also found sitting to be fatiguing.  (Tr. 547.)  In addition to the exam, Dr. Wright also reviewed a "comprehensive" note from Miller's internal medicine doctor and a "rheumatology note."  (Tr. 547.)  Dr. Wright concluded that Miller was on appropriate treatment for his ailments, but that Miller "does not seem able to perform any meaningful long-term work at this time outside of scholarly activity that could be done in bed."  (Tr. 547.)

Dr. Pat Chan, a non-examining consulting physician, completed a review of the record and came to a different conclusion.  (Tr. 550–57.)  He concluded that Miller "remains capable of performing, maintaining and sustaining sedentary exert work functions."  (Tr. 557.)  According to Dr. Chan, Miller can occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk for a total of at least 2 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and was "unlimited" in pushing and/or pulling, including operation of hand and/or foot controls.  (Tr. 551.)  Dr. Chan found that the "objective exam findings" did not support the level of severity endorsed by Dr. Wright.  (Tr. 557.)  He also found no postural, manipulative, visual,

4

communicative, or environmental limitations.  (Tr. 552–54.)  Dr. Chan further concluded that Miller's allegations were only "partially credible" and, specifically, his "reported limitation of only baing [sic] able to walk 100yrds [sic] does not appear to be well supported by objective exam findings." (Tr. 557.)  Dr. Bernard Stevens, another non-examining physician affirmed Dr. Chan's conclusions.  (Tr. 803.)

SSA denied the initial application on June 15, 2009.  (Tr. 89–92.)  After his application was denied upon reconsideration, Miller requested an administrative hearing.  A hearing was held before an ALJ on January 12, 2011.  (Tr. 38.)  Miller, a medical expert, and a vocational expert testified at the hearing.  (Tr. 38–84.)

The ALJ determined that Miller was not disabled.  (Tr. 10–29.)  He found that Miller met the insured status requirements and had not engaged in substantial gainful activity since June 24, 2009.  (Tr. 15.)  Also, the ALJ found Miller had five severe impairments: coronary artery disease status-post cardiac catheterization and stenting, neuropathy, fibromyalgia, obesity, and depression. (Tr. 15.)

At step three, the ALJ determined that Miller's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpt. P, App. 1.  (Tr. 16) and determined Miller's residual functional capacity (RFC) as follows:

> The claimant has the residual functional capacity to perform sedentary work defined in 20 C.F.R. § 404.1567(a) and 416.967(a).  He can lift ten pounds occasionally and ten pounds frequently.  He can stand two hours in an eight-hour workday and sit six hours in an eight-hour workday.  The claimant is only available for simple repetitive, and routine work.  He is able to understand, remember, and carry out simple instructions.  He is able to respond appropriately [sic] supervisors, coworkers, and the public.  He is able to adjust to route changes in the work setting.

(Tr. 17.)  With this RFC, the ALJ found at step four that Miller was unable to perform past relevant work.  (Tr. 23.)   Finally, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (*Id.*)  These jobs included video surveillance monitor, greeter/receptionist, and general office worker.  (Tr. 24.)

Based on these findings, the ALJ concluded that Miller was not disabled within the meaning of the Social Security Act.  (Tr. 24.)   The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Miller's request for review on November 26, 2012.  (Tr. 1–5.)  Miller then commenced this action for judicial review.

## STANDARD OF REVIEW

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'"  *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn.  *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  The ALJ must provide a "logical bridge" between the evidence and conclusions.  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination.  Failure to do so, unless the error is harmless, requires reversal.  *Prochaska v.*

6

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  In reviewing the entire record, the court does not

substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence,

resolving conflicts in evidence, or deciding questions of credibility.  *Estok v. Apfel*, 152 F.3d 636,

638 (7th Cir. 1998).  Finally, judicial review is limited to the rationales offered by the ALJ.

*Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80,

93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).


## ANALYSIS

### I.     Assessment of Treating Physician Opinions

Miller contends that the ALJ failed to give the proper weight to the opinions of his treating

physician, Dr. Garg.  He presents four arguments.  First, Miller contends that the ALJ applied the

wrong legal standard in determining whether Dr. Garg's opinions were entitled to controlling

weight.  Second, Miller argues that the ALJ failed to provide sufficient analysis for meaningful

judicial review.   Third, he argues that, even if the ALJ applied the correct legal standard and

provided sufficient analysis, that Dr. Garg's opinions were entitled to controlling weight because

they were based upon objective findings and test results and were consistent with both her treatment

notes and other medical evidence of record.  Finally, even if the ALJ was correct that Dr. Garg's

opinions are not entitled to controlling weight, the ALJ erred in assigning her opinion "little weight"

because the ALJ failed to consider the factors set forth in 20 C.F.R. §§ 404.1527 and 414.927.

An ALJ must give controlling weight to treating source opinions that are "well supported

by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with

other substantial evidence in the case record."  20 C.F.R. § 404.1527(c)(2); *see also Punzio v.*

*Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). "Not inconsistent" carries a specific definition according to the SSA:

> This is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.

SSR 96-2p, 1996 WL 374188, *3 (July 2, 1996). More weight is given to the opinions of treating physicians because they have greater familiarity with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870. If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

However, "a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2p, 1996 WL 374188, *4 (July 2, 1996). Non-controlling treating source medical opinions still "must be weighed using all of the factors" in 20 C.F.R. §§ 1527 and 416.927. *Id.* The required factors are "length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Campbell*, 627 F.3d at 308 (quoting *Larson*, 615 F.3d at 751); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Dr. Garg became Miller's primary care physician in May 2007. (Tr. 382.) As a doctor of internal medicine, she saw Miller more than a dozen times over the next two years. (Tr. 382, 401–02, 406–07, 413–14, 419–20, 423–24, 428–29, 432–33, 451–52, 467–68, 476–77, 619, 708.) As noted above, Miller presented with multiple complaints and received a variety of treatments over

8

that time period.  Her notes consistently reflect that Miller complained of pain in his lower extremities and more diffusely.  (Tr. 401–02, 407, 413–14, 428–29, 432, 451–52.)  Dr. Garg's notes first mentioned the possibility of fibromyalgia in October 2007.  (Tr. 413–14.)  She prescribed a variety of medications for Miller's neuropathic and diffuse pain, including Lyrica, oxycodone, MS contin, naprosyn, and elavil (Tr. 384, 402, 404, 414, 420, 424, 433, 452, 477.)  She also prescribed Cymbalta for depression.  (Tr. 414, 420, 424, 433.)  Dr. Garg provided a letter, dated January 4, 2011, opining that Miller would struggle to stay on task, work at a slower pace, require unscheduled breaks, and miss work unpredictably due to his "illnesses."  (Tr. 829.)  Dr. Garg wrote a second letter, dated January 18, 2011, that indicated Miller was limited in safe driving due to fibromyalgia and required a cane for ambulation because of "painful peripheral neuropathy as a side effect of his chemotherapy."  (Tr. 830.)

In this case, the ALJ gave "little weight" to the opinions of Dr. Garg because her "conclusions are not supported by the record as a whole and are not consistent with the objective medical findings contained in the medical evidence."  (Tr. 22.)  Although it is not clear from the ALJ's decision, it appears that he found Dr. Garg's opinions were both not well supported by "medically acceptable clinical and laboratory diagnostic techniques" and were inconsistent with other "substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); *Punzio*, 630 F.3d at 710.

First, Miller argues that the ALJ applied the wrong legal standard.  Miller highlights the second half of the ALJ's conclusion statement, that Dr. Garg's conclusions "are not consistent with objective medical findings contained in the medical evidence."  (Tr. 22.)  This statement, according to Miller, "implies the standard for affording controlling weight is if the opinion is consistent with the medical record as a whole."  (Dkt. 10.)  In support of his position, Miller cites to a case from

the Eastern District of Wisconsin in which the court found that similar language in an ALJ opinion did not accurately reflect the "not inconsistent" standard:

> This is not merely a semantic issue. The 'not inconsistent' standard presumes the opinion's prominence and requires the ALJ to search the record for inconsistent evidence in order to give the treating source's opinion less than controlling weight. Under the standard imposed by the ALJ, the opinion only has controlling weight if the record supports it.

*Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001). The Commissioner provides no responsive argument to Miller's legal argument.

Notwithstanding *Dominguese*, I am not convinced that the ALJ's use of "not consistent" rather than "inconsistent" or, perhaps, "not not inconsistent" indicates that the ALJ applied the wrong legal standard. The language is more suggestive of a lack of precision in drafting than a failure to apply the appropriate regulation. If anything, this issue highlights the confusion that results from a regulatory scheme adopting a double negative. 20 C.F.R. § 404.1527; SSR 96-2p, 1996 WL 374188, *1 (July 2, 1996). In isolation, the imprecise language used by the ALJ is not legal error.

The real problem with the ALJ's analysis, however, is that he inverted the test for controlling weight. According to the ALJ, Dr. Garg's "conclusions are not supported by the record as a whole and are not consistent with the objective medical findings contained in the medical evidence." (Tr. 22.) This is an incorrect statement of the legal standard. *See* 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, *1 (July 2, 1996). The treating physician's opinion does not need to be "supported by the record as a whole" (Tr. 22); it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2). The treating physician's opinion does not have to be "consistent with the objective medical findings in the

10

medical evidence" (Tr. 22); it must be "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Because the ALJ failed to follow the applicable regulations, remand is required unless the error is harmless. *Clifford*, 227 F.3d at 863.

Miller's second argument—cursory analysis—highlights the difficulty of judicial review in SSA cases and demonstrates that the ALJ's misstatement of the legal standard cannot be deemed harmless error. Miller contends that the ALJ failed to explain why Dr. Garg's opinions were not consistent with the objective medical findings and, consequently, the ALJ's reasoning falls below the minimal level of articulation required for meaningful judicial review. (Dkt. 10.)

The Commissioner does not directly respond to this argument. (Dkt. 14.) Instead, the Commissioner marshals the evidence in the record that the Commissioner contends support the ALJ's conclusion: cancer is in remission (Tr. 707); hernia was repaired (Tr. 364, 370–71); dermatological problems were resolved (Tr. 680); and symptoms related to coronary artery disease, like chest pain and shortness of breath, were relieved by stents. (Tr. 451, 598–99, 613.) The Commissioner also points to evidence in the record that medications helped Miller's pain from fibromyalgia and peripheral neuropathy (Tr. 384, 471, 544), that Miller described his pain—on one occasion—as a three out of ten (Tr. 432), and that Dr. Garg described Miller's depression as "controlled on medications" during his first appointment. (Tr. 382.) Finally, the Commissioner engages in a defense of the "great weight" the ALJ afforded the opinions of the non-examining physicians, Drs. Chan and Stevens (Tr. 550–57, 803), though Miller does not question the ALJ's decision related to these physicians. (Dkt. 15.)

11

The ALJ's decision contains none of the analysis in the Commissioner's brief.[1] (Tr. 13–24.) The ALJ did summarize part of Miller's medical history, including approximately nine appointments with Dr. Garg. (Tr. 18–21.) The ALJ also described Miller's cardiac problems, treatment, and rehabilitation (Tr. 19–20), two appointments with the rheumatology department (Tr. 19), and one consultation with a pulmonologist. (Tr. 19–20.) The ALJ never mentions Miller's hernia, gastroesophageal reflux disease, thrush, candidiasis, or seborrhea that the Commissioner presents as support for the ALJ's conclusion. (Tr. 13–24.) And it is not surprising the ALJ did not mention them since they are not the impairments that Miller claims prevent him from working. Why the Commissioner cites them as evidence supporting the ALJ's decision is unclear.

Moreover, the ALJ does not accurately summarize the evidence. Importantly in this case, the ALJ found that "regardless of what type of pain is reported, [Miller] notes that his level of pain generally ranges between two and three on a scale of one to ten and never exceeds a level of five." (Tr. 19.) Miller's testimony at the hearing was that his pain is a "four or a five throughout the day" and sometimes up to a ten and even eleven. (Tr. 57.) Nor do the medical records support the ALJ's finding. Based on the court's review, Miller's reported pain levels on the ten-point scale in his medical records are as follows: three (Tr. 401), seven (Tr. 413), four (Tr. 419), four (Tr. 423), four (Tr. 428), three (Tr. 432), three (Tr. 459), two (Tr. 467), six (Tr. 476), and six (Tr. 650). These are

---

[1] In reply, Miller argues that the Commissioner's brief runs afoul the Seventh Circuit's "*Chenery* doctrine" by attempting to apply the proper treating physician standard. (Dkt. 15.) Although the case law on *Chenery* has expanded the doctrine far beyond its original scope and created a de facto standard of articulation for the ALJ in tension with other rules of law, *see Senn v. Astrue*, 12-C-326, 2013 WL 639257 (E.D. Wis. Feb. 21, 2013), even the expanded *Chenery* doctrine favored by the Seventh Circuit does not apply in this case. The Commissioner has not advanced a new rationale or reason for the decision; the Commissioner's brief provides a greater discussion of the rationale the ALJ used, which is precisely its role in these proceedings. To adopt Miller's *Chenery* argument would effectively reduce the arguments available to the Commissioner in constructing a brief to little more than a recitation of the ALJ's decision.

significant discrepancies between the ALJ's finding and the record, especially the ALJ's finding that Miller's reported pain of any type "never exceeds a level of five." (Tr. 19.)

Although the ALJ's decision is entitled to deference on judicial review and will be upheld if "substantial evidence" supports it, I must be able to trace the ALJ's path of reasoning to conduct meaningful review. *Clifford*, 227 F.3d at 874. In this case, the ALJ never provided any reason for his conclusion. I cannot determine from the ALJ's decision what evidence he found to be inconsistent with Dr. Garg's opinions or what clinical and laboratory diagnostic techniques fail to support her conclusions about Miller's incapacities. The ALJ's unexpressed justifications for discounting Dr. Garg's opinion fall far short of "good reasons" to deny the treating physician's opinions controlling weight. *Larson*, 615 F.3d at 751. After presenting a partial and inaccurate summary of Miller's medical history, the ALJ leaves it to the reader to infer the justifications for his decision on the weight of Dr. Garg's opinions. Because the ALJ did not provide "'an accurate and logical bridge' between the evidence and his conclusions," the case must be remanded. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)).

Because the ALJ used the wrong legal standard and failed to provide any meaningful explanation for his conclusion, I do not reach Miller's third and fourth arguments. However, I pause to note that, even if the ALJ applied the correct legal standard and provided a logical bridge to conclude that Dr. Garg's opinions are not controlling, the ALJ must still consider the weight Dr. Garg's opinions were due under the SSA's regulations. *See* 20 C.F.R. § 404.1527(d)(2); *see also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent

13

of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."). After the ALJ's global statement giving "little weight" to Dr. Garg's opinion, the ALJ never considered the required factors or otherwise explained this distinct determination. (Tr. 22.)

The question of whether a treating physician's opinion is entitled to controlling weight is dependent on whether it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "'not inconsistent' with the other substantial evidence in the case record." SSR 96-2p, 1996 WL 374188, *1 (July 2, 1996). On remand, the ALJ should first explain the basis of his conclusion under this legal standard so that a court can trace the path of his reasoning. *Clifford*, 227 F.3d at 874. Second, if the ALJ concludes that Dr. Garg's opinions are not entitled to controlling weight, he should determine what weight her opinions are due under the applicable regulations. 20 C.F.R. § 404.1527(d)(2).

## II.   Assessment of Examining Consulting Physician Opinion

Miller next argues that the ALJ erred in affording "little weight" to the report prepared by Dr. James Wright, an examining consulting physician. Miller contends that the ALJ failed to provide "any significant reason for rejecting Dr. Wright's opinion." (Dkt. 10.) According to Miller, because the ALJ did not provide any reason, there can be no meaningful judicial review and the case should be remanded.

The Commissioner's brief does not defend the ALJ's decision regarding Dr. Wright. Rather, the Commissioner argues that, even if the ALJ erred in rejecting Dr. Wright's opinion, the error was harmless. The error was harmless because the "same previously discussed reasons and evidence that

14

failed to support Dr. Garg's opinion similarly apply to Dr. Wright's opinion." (Dkt. 14.)  Thus, the Commissioner concludes that remand on this issue is not required because there is no reason to believe that the remand might lead to a different decision.

As explained above, however, the ALJ failed to explain why he rejected Dr. Garg's opinion. That failure also applies to the opinion of Dr. Wright.  Just as the case must be remanded to address why Dr. Garg's opinion is rejected, the ALJ should also explain on remand why he rejected Dr. Wright's.

It is true, as the Commissioner notes, that the SSA assigns the decision about the ability to work to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(1); *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002); *Clifford*, 227 F.3d at 870.  Given this assignment, Dr. Wright's opinion concerning Miller's ability to work may not be the kind of "medical opinion" that an ALJ must consider under 20 C.F.R. § 404.1527.  But even if Dr. Wright's opinion of Miller's "ability to work is not a 'medical opinion' under the regulatory checklist, that does not mean that the ALJ should have ignored that statement." *Roddy*, 705 F.3d at 638 (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)).  "Although the ALJ does 'not give any special significance' to such opinions, he still must consider 'opinions from medical sources' in determining the claimant's residual functional capacity."  *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)–(3); *Bjornson*, 671 F.3d at 647–48; *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 204)).  Because the ALJ failed to consider Dr. Wright's opinion under this framework, the issue must be remanded.

Accordingly, and for the reasons set forth above, the Commissioner's decision in this case must be reversed and remanded pursuant to 42 U.S.C. § 405(g)(sentence 4).  Whether Miller is

disabled or not is for the ALJ or Commissioner to determine on remand in accordance with the

procedural rules the SSA has implemented and the precedents provided by the Court of Appeals.

     **SO ORDERED** this   24th   day of October, 2013.


                                          s/ William C. Griesbach
                                          William C. Griesbach, Chief Judge
                                          United States District Court

16